IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CARMEN LARSON,

                            Plaintiff,                                           CV-05-1769-ST

            v.                                                FINDINGS AND
                                                      RECOMMENDATION

TILLAMOOK YOUTH AUTHORITY
ACCOUNTABILITY CAMP; STATE OF
OREGON; and ANDY WYATT, TERRY
YOUNKIN, and BRIAN FLORIP, each
individually and in their official capacities,

                              Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

       Plaintiff, Carmen Larson ("Larson"), originally filed this action in Multnomah County

Circuit Court for the State of Oregon, *Larson v. Tillamook Youth Authority Accountability Camp*,

*et al.*, Civil No. 0509-09147, seeking damages for being constructively terminated from her job

as a youth counselor at the Tillamook Youth Authority Accountability Camp ("TYAAC") in

September 2004, following over a year of sexually harassing behavior by managerial employees

1 - FINDINGS AND RECOMMENDATION

at TYAAC, including Andy Wyatt ("Wyatt") and Terry Younkin ("Younkin"), and an ineffective response to her complaint by Younkin and two other managers, Dave Lindstrom ("Lindstrom") and Brian Florip ("Florip"). The original Complaint alleged eight claims for relief against the State of Oregon, TYAAC, and these four individual defendants for violation of 42 USC § 1983, 42 USC § 2000e-17, wrongful termination, and intentional infliction of emotional distress ("IIED").

On November 22, 2005, five of the six defendants filed a Notice of Removal of Action Under 28 USC § 1441(b) (docket #1).[1] Following two rounds of motions to dismiss, Larson filed a Second Amended Complaint (docket #38)[2] on September 18, 2006, alleging: (1) three claims under 42 USC § 1983: (a) against Younkin and Florip for violation of Larson's procedural due process rights ("First Claim"); (b) against Wyatt, Younkin, and Florip for violation of her rights under the First Amendment ("Second Claim"); and (c) against Wyatt, Younkin, and Florip for violation of her right to equal protection ("Seventh Claim"); (2) three claims for violation of 42 USC § 2000e-17 against defendants TYAAC and the State of Oregon for: (a) sexual harassment ("Third Claim"); (b) sex discrimination ("Fourth Claim"); and (c) retaliation ("Fifth Claim"); and (3) against the TYAAC and the State of Oregon for wrongful termination ("Sixth Claim").[3]

---

[1] Wyatt did not join in the Notice of Removal and is represented by a different attorney than the other defendants.

[2] In that pleading, Larson voluntarily dismissed her claims against Lindstrom and modified the caption and allegations to correct the spelling of defendant Florip's last name. The caption reflects those changes.

[3] This court previously dismissed the IIED claim alleged in the First Amended Complaint against all defendants but Wyatt. Findings and Recommendation dated March 27, 2006 (docket #27), adopted by Order dated May 10, 2006 (docket #32). The Second Amended Complaint does not allege any IIED claim.

2 - FINDINGS AND RECOMMENDATION

All defendants except Wyatt have filed a motion seeking summary judgment against each of Larson's seven claims seek.  State Defendants' Motions for Summary Judgment (docket #43). For the reasons that follow, that motion be granted against Larson's Second Claim under the First Amendment and denied in all other respects.  The court also should grant summary judgment *sua sponte* to Wyatt against Larson's Second Claim.

<u>**DISCUSSION**</u>

## I. <u>Legal Standard</u>

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 631 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the

nonmoving party." *Id* (citation omitted).  Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party.  *Id* at 631.

The Ninth Circuit has set a "high standard for the granting of summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir 1996).  Under this standard, "very little evidence" is required to survive summary judgment because the "ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, on a full record." *Lam v. Univ. of Hawaii*, 40 F3d 1551, 1564 (9th Cir 1994), quoting *Sischo-Nownejad v. Merced Cmty. College Dist.*, 934 F2d 1104, 1111 (9th Cir 1991) (internal quote marks omitted).

## II.  Undisputed Material Facts

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence in the light most favorable to Larson.  A review of the parties' facts, as well as the other materials submitted by the parties, including affidavits, declarations, and deposition excerpts,[4] reveals the following:

### A.  Oregon Youth Authority's Mission and Facilities

Oregon Youth Authority ("OYA") is an independent department of the State of Oregon which exercises legal and physical custody over youth offenders between the ages of 12 and 18 who have been committed to the OYA by county juvenile courts.[5]  OYA operates a number of

---

[4]  Both parties have submitted documents with various attachments.  Citations to affidavits, declarations, and depositions are identified by the last name of the affiant or deponent, and citations are to the paragraph(s) of the affidavit or declaration or page(s) of the deposition transcript.  Larson's exhibits are attached to the Declaration of Charese Rohny (docket #55) and defendants' exhibits are attached to Defendants' Concise Statement of Material Facts in Support of State Defendants' Motion for Summary Judgment (docket #44).  References to those exhibits are to the exhibit number (defendants' exhibits) or letter (Larson's exhibits).  When affidavits and declarations are submitted as exhibits, the exhibit number or letter is provided with the first citation.

[5]  Oregon Youth Authority, http://www.oregon.gov/OYA/about_us.shtml (last visited 2/21/2007).

facilities, including the TYAAC and Camp Tillamook, both located in Tillamook, Oregon.

TYAAC opened in March 1997 and is a medium-security facility designed to house 50 non-

violent youth offender males in a highly-structured four-month program.[6]  Camp Tillamook, also

operated by OYA, is a minimum-security facility designed to assist male adolescent sex-

offenders transition from OYA youth correction institutions to their communities.[7]

### B.  Management of and Larson's Career with TYAAC

Younkin was hired by OYA on January 1, 1997, as the Director of the newly formed

TYAAC.  Larson Ex D.  He was responsible for personnel issues and for ensuring that TYAAC

complied with OYA guidelines, including ensuring that TYAAC was free of harassment and

immediately investigating and addressing any issues that arose.  Younkin Aff (Defs' Ex 4), ¶ 2;

Defs' Ex 17, pp. 2-6.  Florip was the Assistant Director of Facility Operations for OYA,

responsible for providing executive-level leadership in the administration of OYA facilities

statewide.  Florip was Younkin's off-site supervisor.  Florip Aff (Defs' Ex 15), ¶ 2.

Larson had a 14-year career with the State of Oregon, half of which she invested at

TYAAC.  Larson began working for TYAAC as a youth counselor in February 1997, shortly

before its opening in March 1997.  Defs' Ex 6; Larson Depo, p. 45; Younkin Depo, p. 178;

Larson Ex E.

### C. Sexual Harassment Policies at TYAAC

---

[6] Oregon Blue Book, http://www.sos.state.or.us/bbook/state/executive/Youth_Authority/youth_authority_history.htm (last visited 2/21/2007).

[7] Oregon Blue Book, http://bluebook.state.or.us/state/executive/Youth_Authority/youth_authority_history.htm (last visited 2/21/2007).

OYA policies forbid sexual harassment, require all employees to attend sexual harassment training, and require managers to address any harassment complaints and ensure a harassment free workplace. The policy provides for informal complaints, formal complaints to a supervisor, or if the supervisor is the harasser, their supervisor or Human Resources, and allows for complaints to the Governor's affirmative action office. Defs' Ex 14.

TYAAC provides a number of methods for an employee to report sexual harassment, including making written or verbal complaints to management. Lenz Depo, p. 30. There is an official complaint form. Employees can notify anyone in management and also can file a grievance through the union. Defs' Ex 7; Larson Depo, pp., 455-59; Younkin Aff, ¶ 18; Lenz Depo, p. 30. The spirit of the policy is to make employees feel they can approach management. Florip Depo, p. 24. Therefore, employees are not dissuaded from approaching a different manager to complain. *Id*. Larson knew of the options available for making written or verbal complaints of sexual harassment at TYAAC. Defs' Ex 7; Larson Depo, pp. 455-49; Younkin Aff, ¶ 18.

### D. **Discipline of Younkin in Early 2003**

The record does not reveal the nature of the work environment at TYAAC during the late 1990s when Larson first started working there. However, by late 2002, HR was conducting an investigation into allegations of gender discrimination and overall poor management. Larson Ex A. Some time during 2002 in a staff meeting with TYAAC's management team, Younkin responded to a suggestion made by Larson by saying "Fuck You Carmen" and writing "Fuck You" on a whiteboard. In October 2002, a TYAAC employee, Jake Jackson ("Jackson"), reported that incident to Personnel Representative, Jim McDonald ("McDonald"). *Id*. Jackson

also told McDonald that "female employees at TYAC were being treated differently and unfairly," that "Larson is taking a horrible beating being discounted by other managers and directors," and that promotions, career development rotations, selections, and lead work were assigned to employees who were "predominately male."[8]  *Id*.  Younkin admits he participated in many comments and jokes of a sexual nature in the workplace and that he is sure Larson was present for some of those.  Younkin Depo, pp. 201-02.

The investigation by HR continued into early 2003 and during that time, Larson apparently told HR about her concerns regarding treatment by Younkin.  Larson Ex B.  On January 31, 2003, Younkin was notified that he was suspended for one week without pay from February 10-16, 2003.  Larson Ex D.  The suspension notice was based on the obscene comments directed at Larson, as well as on Younkin's acts of flipping "the bird" at an employee, telling sexually explicit jokes, displaying inappropriate graphic materials (large graphic of animated figures copulating), and failing to respond to employee concerns about the surreptitious tape recordings, as well as failing to address reports by Larson that another employee had criticized her and called her a "back stabbing, lying bitch."  *Id* at 3-4.  Shortly after that suspension, Younkin took down a picture board Larson had created and revoked her Volunteer Community Coordinator position.  Larson Aff, ¶¶ 6(b) & (c).

///

///

---

[8]  Jackson made a number of other allegations, including that a TYAAC employee was surreptitiously tape recording conversations with coworkers, that another TYAAC employee was receiving unwarranted and preferential treatment by being paid in a job category which his work did not fall under, and that TYAAC's Camp Director (presumably Younkin) was not at TYAAC "even when near riot" and was unresponsive to employee complaints.  Larson Ex A.

### E.  **Wyatt Commences Work at TYAAC**

A few months after Younkin was suspended, in the spring of 2003, Wyatt began working at TYAAC as a counselor and became one of Larson's co-workers.  During the summer of 2003, Wyatt regularly and frequently stated to Larson that he was "hot," that he believed Larson wanted his body, and that other women wanted his body.  Larson Depo, p. 105.  Beginning in August 2003 and continuing through the fall of 2003, Larson reported to Younkin that she was offended by the way Wyatt talked, including Wyatt often stating that he looked "hot" or that his outfits made him feel "hot" and that he knew Larson wanted his body.  Larson Depo, pp. 105-08, 123, 451; Larson Decl, ¶¶ 4, 7(a).  Larson told Younkin she was "grossed-out" by Wyatt's offensive comments.[9]  Larson Depo, p. 105; Younkin Depo, p. 46; Miller Decl, ¶ 5.  She also reported concerns about Wyatt's physical appearance and dress in front of sex offender youths as well as staff and coworkers.  Larson Depo, p. 105.  Throughout Larson's employment, Wyatt demonstrated a "short fuse," slamming doors and using an "aggressive tone."  *Id* at 108-10.  She also reported this to Younkin.  *Id* at 119.  Despite Larson's complaints, Wyatt's behavior continued.  *Id* at 106-08.

### F.  **Wyatt's Promotion into a Position as Larson's Supervisor**

In late 2003, TYAAC had an opening for a treatment manager.  Larson was part of the panel that conducted the interviews for that position.  Shortly before Wyatt's interview, Larson reported to Younkin that she was concerned about Wyatt being in a managerial position given how he spoke with female staff.  *Id* at 119.  Younkin responded that they were "going to work it

---

[9]  Although Younkin acknowledges complaints by Larson prior to June 2004, he asserts that those complaints were only vague statements that Wyatt was "gross" and that he was unaware that Larson was complaining about sexually inappropriate or harassing behavior.  Younkin Aff, ¶ 7.

out." *Id*.  Younkin also learned from another TYAAC employee that Wyatt had a violent temper and a history of aggressive anger in the workplace.  Allen Depo, pp. 13-14, 20.  Despite that information, Younkin instructed Larson to choose Wyatt as her first choice during the interview process.  Larson Depo, p. 495.  She did so (Defs' Ex 9), but immediately after the panel dispersed, told Younkin that she preferred a different candidate as her number one choice.  Larson Depo, pp. 495-96.  Younkin told her it was too late.  *Id* at 496.  Beginning in January 2004, Wyatt became a treatment manager and Larson's supervisor.  Younkin Aff, ¶ 4; Defs' Ex 8; Larson Depo, pp. 61-63.

### G.  Wyatt's Behavior as Larson's Supervisor

During the spring of 2004, Wyatt subjected Larson to increasing supervision and unreasonable supervision.  Larson Depo, p. 195.  He would frequently watch or call Larson to inquire about what she was doing, scrutinize her work, and not leave her alone.  *Id*.  In February 2004, Larson requested time off, but Wyatt refused and delayed approval of that time off until May 2004.  *Id* at 191-93.

Wyatt failed to respond to complaints about sexually offensive photographs circulating in the workplace.  On several occasions, another employee, Josh Long, showed sexually offensive photographs on his cell phone, including photographs of an erect penis and other sexually graphic material.  Hovden Depo, pp. 87-79; Miller Decl, ¶ 3; Wyatt Depo, pp. 34-41.  Wyatt was aware of these offensive photographs and participated in the banter about them.  Hovden Depo, pp. 87-79.  When Larson complained, Wyatt simply said "don't worry about it, you are only upset because you didn't get to see it."  Larson Decl, ¶ 4.  Larson told Younkin about both the incident and about Wyatt's failure to do anything about it.  *Id*; Younkin Depo, pp. 48-50.

Younkin did nothing about Wyatt's behavior and simply remarked that he was "glad Josh Long is returning to North Coast," implying that Long's behavior would be tolerated at an adjunct facility.  Larson Decl, ¶ 4.

During the spring of 2004, Larson continued to complain to Younkin about Wyatt's behavior.  Younkin requested that Larson document Wyatt's behavior, which she did.  Larson Depo, pp. 471, 477-78; Larson Ex F.

As part of a family business, Larson and her husband sell beef, including Texas Longhorn beef.  In April 2004, Wyatt purchased beef from Larson.  Larson Ex F, p. 1.  He later approached Larson while wearing a "western outfit," including a large western-style belt buckle.  *Id*.  Thrusting his pelvic area forward, he asked Larson "Is mine bigger than [your husband]'s?"  *Id*.  When Larson asked him why he talks that way, Wyatt laughed, asked her what she thought he was referring to and said she knew he was "hot" and "wanted" him.  *Id*.

In May 2004, Wyatt paid Larson for the beef in Younkin's presence, Wyatt handed Larson the check for the beef and stated in a sexually suggestive manner that "it was very good I would love more."  Younkin Depo, pp. 54-55.  Larson told Younkin that she felt Wyatt was treating her like a prostitute and was offended by the sexual connotations of Wyatt's comment.  *Id.*

On May 11, 2004, in the Control Room, Wyatt watched the TYAAC nurse, Cindy [Berry] Allen, walk through and then turned to Larson and stated: "She makes me feel like having fellatio."  Larson Depo, p. 126; Larson Ex G, p. 2.  Larson reported this incident to Lisa Hovden ("Hovden") (Hovden Depo, p. 25) and complained to Lindstrom, a treatment manager of another team at TYAAC.  Larson Depo, p. 126.  Lindstrom responded that Wyatt was

"perverted" and then recounted a story to Larson about how Lindstrom previously had to quit a job due to sexual harassment by his female supervisor. *Id*. Lindstrom explained that, in his situation, he felt like he was "damned" if he said anything and "damned" if he said nothing. *Id* at 127. The following day, Lindstrom approached Larson and told her he wanted to bring Wyatt's behavior to Younkin's attention. *Id*. Larson told Lindstrom she had already spoken with Younkin and felt that it was "no use" to talk to him again. *Id*. She also believed that Younkin would be upset with her for involving a new treatment manager (Lindstrom) because TYAAC had experienced such high turnover with treatment managers and asked Lindstrom to just "drop it." *Id* at 129. Lindstrom told to at least speak with Wyatt and then email him and let him know if she was satisfied or unsatisfied. *Id*.

Larson did speak with Wyatt, and his response was that she should "kiss his ring." *Id*. After considering the story that Lindstrom had told her and that Lindstrom a new treatment manager at TYAAC, Larson emailed Lindstrom, informing him that she had spoken with Wyatt and was satisfied with the outcome. *Id* at 129-30; Defs' Ex 10. However, soon after that email, she periodically requested that Lindstrom speak with Wyatt. Larson Depo, p. 132.

A week later, on May 18, 2004, shortly after Wyatt returned to work from his honeymoon, Larson and Hovden were in the hallway at TYAAC. *Id* at 142. Hovden asked Wyatt how he liked being married. *Id*. Wyatt responded by telling them how he had "devirginized" his wife and that she "takes it every way he does it." *Id* at 142-43; Hovden Depo, p. 33. Hovden then told Wyatt that he should not make such comments and that it was sexual harassment. Hovden Depo, p. 33. Wyatt responded that he could say whatever he wanted because he was a manager. *Id*.

11 - FINDINGS AND RECOMMENDATION

### H.  **Larson's Final Two Weeks at TYAAC**

Janet Ferris ("Ferris") was an Office Specialist for TYAAC, as well as TYAAC's Union representative.  On June 11, 2004, Ferris apparently approached Younkin about an offensive email Wyatt had sent out to TYAAC staff.  Larson Ex G, p. 1.  About a week later, on June 17, 2004, Wyatt approached Ferris in the administration hallway and told her that he "had a bone to pick" with her, did not want her going "over his head with anything" to Younkin, and was not going to apologize about the email.  *Id*.  Ferris felt intimidated by Wyatt's demeanor and appearance.  *Id*.  Later that same day, Ferris told Younkin that there was going to be a group grievance filed concerning Wyatt's behavior, based in part on a journal that another employee was keeping.  *Id*; Younkin Depo, pp. 60, 180.  Younkin asked Larson about the journal she was keeping regarding Wyatt's behavior.[10]  Larson Depo, pp. 477-78.  Larson provided him with copies of the first few pages of her journal, which detailed several inappropriate sexual comments Wyatt allegedly made in front of Larson and other TYAAC staff.  *Id*; Larson Exs F-G. Younkin began an investigation of Wyatt and instructed Wyatt not to retaliate against any employees in any way.  Younkin Aff. ¶¶ 8-9.

On June 21, 2004, Younkin sent a letter to Mary Lenz ("Lenz"), OYA's Human Resources ("HR") Manager, requesting that Wyatt be terminated from his trial service as a treatment manager, with the option to return to a psychiatric social worker position.  Larson Ex G.  That letter cited the incident between Wyatt and Ferris on June 17, 2004, as well as the incident on May 11, 2004, between Wyatt, Larson, and Hovden.  *Id*.

---

[10]  Younkin denies knowing about the journal prior to his conversation with Ferris on June 17, 2004.  Younkin Depo, p. 60.

During Larson's last weeks at TYAAC in June 2004, Wyatt unreasonably subjected Larson to increased supervision and escalated his behavior toward her into verbal and physical intimidation.  Atilano Decl, ¶ 5; Larson Decl, ¶¶ 7(d), 9-11; Larson Depo, pp. 195-96.  Larson found it impossible to do her job with Wyatt based on his increased yelling and constant demand for job duties descriptions.  Larson Decl, ¶¶ 9-11.  His actions appeared retaliatory to Larson as she had not otherwise been reprimanded or disciplined for performance issues.  *Id*, ¶ 8.

On June 23, 2004, Younkin told Larson that he needed her journal entries by noon that day.  Larson told Younkin that Wyatt had been harassing her all week.  Larson Ex F, p. 6.  When Larson asked Younkin if Wyatt was aware of  his investigation, Younkin replied affirmatively.  *Id*.  Younkin told Larson to go into Hovden's office to complete her documentation for him, but she found the task impossible because Wyatt hounded her all day to obtain a list of her job duties. *Id*.  Wyatt called Larson into his office and asked her whether she knew anything about a sexual harassment claim against him.  *Id*.  She said she knew things were going on, but was not paying attention to them.  *Id*.  Wyatt asked her about her job performance and stated in an angry tone and with great urgency that he and Younkin needed to know immediately all job duties that Larson performed.  *Id* at 7; Larson Depo, pp. 158-60.  Wyatt then sent an email to Larson stating she must immediately create a list of her job duties.  Larson Ex F, p. 7.

Around noon on June 23, 2004, Larson provided Younkin with information on the incident when Wyatt stated that the nurse made him feel "like having fellatio," and told Younkin that her report was "going to cause hell for [her] here."  *Id* at 7-8.  At the end of Wyatt's shift on June 23, 2004, he told Larson that she "better have his list for him tomorrow."  *Id* at 8.

13 - FINDINGS AND RECOMMENDATION

On June 24, 2004, Younkin left the TYAAC site to meet with Florip to discuss plans

regarding Wyatt.  Immediately after Larson arrived at work that day, Wyatt ordered her into his

office.  *Id* at 8; Larson Depo, p. 175; Larson Decl, ¶¶ 10-11.  When Younkin called Larson, she

pleaded with Younkin to do something about Wyatt, telling Younkin she "felt like she had a

shark on [her] back and it was getting worse."  Larson Decl, ¶ 10.  Younkin told her to "hang in

there."  *Id*.

Wyatt closely scrutinized Larson throughout the day, tracking her every move.  Larson

Ex F, pp. 9-10.  He then yelled at her while she was in the Control Room and insisted she come

into his office to discuss her job duties.  *Id* at 10; Larson Depo, p. 195.  Co-worker Randy Bush

offered to accompany Larson, but Larson instead requested that Ferris, her union representative,

be allowed to come with her into Wyatt's office.  Larson Ex F, pp. 10-11; Larson Depo, p. 151.

Wyatt refused to talk with Ferris present.  Larson Ex F, p. 11; Larson Depo, p. 150.  Larson, who

was upset by this point, left the room with Ferris who agreed Larson should leave the premises

for her safety and because, emotionally, Larson could not finish her work day.  Larson Ex F, p.

11; Larson Depo, p. 156.  Ferris offered to escort Larson out of the building.  Larson Ex F, p. 11;

Larson Decl, ¶11.  Larson reported the incident to treatment manager Lindstrom who gave her

permission to leave.  *Id*.  Larson left and never returned to TYAAC.

### I.  <u>Discipline of Wyatt and Larson's Efforts to Return to Work</u>

On June 30, 2004, Wyatt was disciplined by being removed from trial service as a

treatment manager at TYAAC and was returned to his position as a Qualified Mental Health

Professional.  Defs' Ex 13; Younkin Aff. ¶ 12; Florip Aff. ¶ 5.  He also received a letter of

14 - FINDINGS AND RECOMMENDATION

expectations, reiterating the OYA sexual harassment policy, which he read and signed.  Defs'
Ex 13.

After leaving the TYAAC premises on June 24, 2004, Larson went on medical leave.  On
July 19 and 21, 2004, Larson attempted to contact Younkin, but he failed to return her calls.
Defs' Ex 11.  In July 2004, Larson filed a grievance with her union about Wyatt's behavior.
Larson Exs H & I.  On July 23, 2004, Glenn Smith ("Smith"), HR Analyst with the OYA, sent a
"Second Step Grievance Response" letter to Ferris, with a copy to Younkin, in which Smith
stated that when "Larson is cleared by her attending physician to return to work, [OYA] would
like to see her return."  Larson Ex I.

On July 29, 2004, Larson called Lindstrom and requested his help in getting a response
from Younkin.  Defs' Ex 11, p. 1.  At the beginning of each week in August and the first week of
September, Larson called and spoke with Younkin about her health conditions and returning to
work.  Larson Decl, ¶ 12.  During each of those calls, Larson asked if Younkin would assist her
in returning to a safe work environment, free of harassment.  *Id*.  Younkin rejected all of
Larson's suggestions and consistently acted unwilling to try to make the work environment free
from harassment.  Larson Depo, pp. 436-38.  With each conversation, Larson began to lose hope
and became further discouraged that any meaningful action would ever be taken.  Larson Decl, ¶
12.  Meanwhile, Younkin contacted Larson's doctor without her permission.  Larson Ex L, p. 3;
Larson Depo, p. 307.

On September 8, 2004, Larson wrote Florip a letter reporting the history of her calls with
Younkin.  Defs' Ex 11; Larson Depo, p. 434; Larson Decl, ¶ 13.  In that letter, Larson made six
suggestions in order to have a "safe work environment, free of harassment and with the least

amount of contact possible with Mr. Wyatt." Defs' Ex 11, p. 1. Five of the six suggestions would have eliminated all contact with Wyatt (moving either Larson or Wyatt to Camp Tillamook, moving Wyatt to the North Coast, putting her on a graveyard shift if need be, and moving her hours so that she went off shift and Wyatt came on shift at the same time). The letter emphasized that having regular contact with Wyatt would not be safe for her. *Id* at 2 ("simply having Mr. Wyatt in another unit, divided only by a wall, working the same hours in the same building, will lead to his having regular contact with me and will not be a safe working environment for me"). It also stated her desire to have no contact with Wyatt, noting that she has "received no information from anyone as to how [TYAAC] intends to ensure the harassment will stop" and that TYACC has instead ignored her requests that she be "free from contact from Mr. Wyatt," and ending by asking whether Florip could help her return to work "where [she] will not have any contact with Mr. Wyatt." *Id*.

**J.**  **The September 21, 2004 Meeting**

On September 21, 2004, Larson met with Younkin, Florip, and Lenz to discuss her return to work. Larson Depo, pp. 417-18; Younkin Aff ¶ 15; Defs' Ex 15; Florip Aff. ¶¶ 6-8. Prior to the meeting, Larson contacted the Union representative from Camp Tillamook, Gary Westoby ("Westoby"), and asked for assistance. Larson Depo, p. 417. Westoby was unable to go to the meeting because he already represented Wyatt and had a conflict of interest. Westoby Decl, ¶ 3. However, he advised Larson that if her Union representative (Ferris) was not going to be with her at the meeting, to invoke her *Weingarten* rights."[11] *Id* at ¶ 4. He also advised Larson that if

---

[11] In *NLRB v. J. Weingarten, Inc.*, 420 US 251 (1975), the Supreme Court found that an employer's denial of an employee's request that a union representative be present at an investigatory interview which the employee reasonably believed might result in disciplinary action constituted an unfair labor practice.

she was denied representation, she should not be insubordinate but continue with the meeting.  *Id*
at ¶ 5.

Just before the meeting, Larson contacted Ferris who declined to attend the meeting.
Larson Depo, p. 417.  When Larson went to the meeting and requested her *Weingarten* rights,
Younkin told her that all he wanted to do was to sit down and discuss scheduling with her.  *Id* at
418.  Larson then gave her input into each of the six options outlined in her letter to Florip.  *Id* at
429.  Younkin told Larson he "could not afford" to have her work in a separate building from
Wyatt and rejected her suggestion that she work a graveyard shift.  *Id* at 430-31, 438.  There was
little or no discussion of her suggestions that she work a shift which ended when Wyatt's shift
started or that Wyatt be moved either to North Coast or to Camp Tillamook.  *Id* at 430-31.  This
left her suggestion that she be moved to Camp Tillamook.

During the meeting, Younkin and Florip took a short break to go over to Camp
Tillamook and inquire about options for Larson working there.  *Id* at 432.  The Director at Camp
Tillamook apparently agreed that Larson could work there.  However, after Larson agreed that it
would satisfy her concerns if she were able to work at Camp Tillamook, Younkin then stated that
he would pull her out of Camp Tillamook to have her work at TYAAC any time it was short
staffed, which according to Larson happens "all the time."  *Id* at 435, 440.  By this point in the
meeting, Larson "was crying too much" for the meeting to continue, so Florip stood up and said:
"We can talk about this at a later date."  *Id* at 435, 440.

At the meeting, it appeared to Larson that defendants found it acceptable for her to
continue to have contact with Wyatt.  *Id* at 437-38.  No one ever told Larson she would not have
to work with Wyatt.  During her weekly telephone conversations with Younkin, Larson was led

17 - FINDINGS AND RECOMMENDATION

to believe that Wyatt was going to be removed from his position at TYAAC.  *Id* at 437.

However, during the September 21, 2004 meeting, Younkin made it clear that TYAAC

management was "going to do whatever they wanted to do with [Larson] and her shifts" and she

was "just going to have to live with it."  *Id* at 437-38.  The only option seriously discussed at the

meeting of moving Larson to Camp Tillamook was followed by Younkin's announcement that

she would be pulled out of Camp Tillamook to work at TYAAC any time TYAAC was

understaffed, virtually guaranteeing that Larson would be forced to continue working alongside

Wyatt regularly given that TYAAC is understaffed "all the time."  *Id* at 435, 440.

### K.  Larson's Letter of Resignation

On September 22, 2004, Larson sent a letter of resignation to Florip, with a copy to Lenz,

spelling out her understanding of the meeting, which included that she "would be forced to be

supervised by and work with the very people who harassed [her], failed to take action to stop the

harassing conduct, and/or who [would] retaliate against [her]."  Defs' Ex 12, p. 2.  She was

"distressed and hopeless about the options . . . offered for [her] return to work" which included

that she continue to work with Wyatt, or fill an 8-10 week temporary position at Camp

Tillamook "and after that temporary period a likely return to TYAAC with Andy Wyatt."  *Id* at

1.  Larson concluded that the harassment would not end, that management did not take the

hostile work environment seriously, and that Wyatt and Younkin would continue to harass and

retaliate against her.  *Id*.  Defendants did not respond to her letter.

///

///

///

### III. <u>Analysis</u>

A review of the parties' motions reveals that defendants' arguments turn largely on their contention that Larson cannot establish that she was constructively terminated. Instead, they argue that she improvidently resigned, which undercuts all of her claims and entitles defendants to prevail on the *Faragher/Ellerth* affirmative defense. Before examining the sufficiency of the factual basis for Larson's contention that she was constructively terminated, this court will first examine two preliminary issues raised in defendants' motions.

### A. <u>Preliminary Issues</u>

#### 1. <u>Wrongful Termination (Sixth Claim)</u>

One argument raised by defendants is that Larson cannot proceed on her Sixth Claim for wrongful termination because Title VII provides adequate remedies. This court previously rejected that argument when ruling on defendants' motion against the First Amended Complaint. *See* Findings and Recommendations dated March 27, 2006 (docket #27), p. 11, adopted by Order dated May 11, 2006 (docket #32). Furthermore, this court has since rejected that argument in other cases. *Cox v. Vanport Paving, Inc.*, 2006 WL 1582302 (D Or, June 2, 2006); *Williams v. Home Depot USA, Inc.*, 2006 WL 1005076 (D Or, April 13, 2006); *but cf. Perez-Ramirez v. Bimbo Bakeries USA, Inc.*, 2006 WL 2902873 (D Or, October 5, 2006) (relying on cases alleging retaliation for opposing an employer's discriminatory practices against others). This court discerns no persuasive reason to revisit its prior decisions.

///

///

///

## 2. *Faragher/Ellerth* Defense

The State of Oregon and TYAAC also argue both that they are entitled to assert and prevail on a *Faragher/Ellerth* affirmative defense against the Third Claim alleging sexual harassment.[12]  This court disagrees.

This affirmative defense traces its origins to two Supreme Court cases, *Faragher v. City of Boca Raton*, 524 US 775 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 US 742 (1998). Supervisory harassment of an employee generally can result in vicarious liability to the employer without regard to whether the employer had knowledge of the harassment.  *Ellerth*, 524 US at 759.  However, if the employer has taken "no tangible employment action" against the employee, the employer may raise an affirmative defense consisting of two elements:  (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.  *Faragher*, 524 US at 806.

In *Pennsylvania State Police v. Suders*, 542 US 129 (2004), the Supreme Court resolved a conflict in the Circuits on the issue of whether a constructive discharge brought about by supervisory harassment ranks as a tangible employment action and, therefore, precludes assertion of the *Faragher/Ellerth* affirmative defense.  The Court concluded that the affirmative defense was not available when a "supervisor's official act precipitates the constructive

---

[12]  The *Faragher/Ellerth* defense is not expressly raised as an affirmative defense in the Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint (docket #40), filed on September 27, 2006.  The failure to specifically raise this affirmative defense in the Answer may provide an additional basis for Larson to argue that it is not available to defendants. However, by concluding that the *Faragher/Ellerth* affirmative defense is substantively not available, this court need not and does not address this procedural question.

discharge," but was available absent such a tangible employment action. *Id* at 148. As it explained:

> [H]arassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts. Unlike an actual termination, which is *always* effected through an official act of the company, a constructive discharge need not be. A constructive discharge involves both an employee's decision to leave and precipitating conduct: The former involves no official action; the latter, like a harassment claim without any constructive discharge assertion, may or may not involve official action.

*Id* (emphasis in original).

Larson contends that several "official acts" precipitated her constructive discharge, including: (1) the revocation of her duties and threat of more changes to her job responsibilities; (2) increased supervision; and (3) the offer by managerial employees at the September 21, 2004 meeting to move her into a temporary position where she would be pulled back to work with Wyatt. It is difficult to characterize Wyatt's demands to Larson that she provide him with a list of her job duties, increasing supervision, and threats to change her job responsibilities as anything more than continuing harassment, not officially sanctioned by managerial employees of TYAAC.

However, this court agrees with Larson that the job offer made to Larson at the September 21, 2004 meeting is the functional equivalent of an "official act" of transfer, if not a demotion, from a permanent to a temporary job assignment. The persons making this offer included her second and third level supervisors (Younkin and Florip), as well as OYA's HR Manager (Lenz). Had Larson accepted that offer, there would have been an official act of transfer that ultimately could have resulted in further sexual harassment. Based on this record,

this court concludes that the defendants may not raise the affirmative defense articulated in *Faragher/Ellerth*.

**B.  Claims Against TYAAC and the State of Oregon**

TYAAC and the State of Oregon base their request for summary judgment against Larson's claims on two related arguments.  They argue both that the conditions to which Larson was subjected were not sufficiently egregious to support her claims and that Larson was not discharged, but instead quit in the face of management efforts to craft an acceptable solution to allow her to return to work.  As explained below, this court rejects both of these arguments.

**1.  Legal Standard – Hostile Work Environment & Constructive Discharge**

In order to succeed on a claim for constructive discharge, the plaintiff must show that the working conditions he or she endured were "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer."  *Wallace v. City of San Diego*, __ F3d __, 2007 WL 438801 *13 (9th Cir Feb. 12, 2007) (internal quote marks and citations omitted).  "Constructive discharge occurs when, looking at the totality of the circumstances, a reasonable person in the employee's position would have felt that he [or she] was forced to quit because of intolerable and discriminatory working conditions."  *Id* at *6 (internal quotations and citation omitted).  The inquiry is normally a factual question reserved for the jury.  *Id*, citing *Schnidrig*, 80 F3d at 1411.

Although claims for hostile work environment harassment and constructive discharge are related and may be based on some or all of the same conduct, a claim for constructive discharge requires a higher degree of proof, namely proof of "conditions so intolerable that a reasonable

person must leave the job." *Id* at *13 (citations omitted).  Thus, where a plaintiff "fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." *Brooks v. City of San Mateo*, 229 F3d 917, 930 (9th Cir 2000).

### 2.  Whether a Reasonable Person Would Have Felt Forced to Quit

For purposes of these motions, defendants do not dispute that Wyatt sexually harassed Larson.  However, defendants do dispute the relevance of the history between Larson and Younkin, asserting that it is so far removed in time from what took place between Larson and Wyatt that it cannot be considered.  Moreover, defendants insist that Larson has submitted insufficient evidence of conditions so intolerable that a reasonable person would have felt compelled to leave the job.  Defendants argue that Larson resigned in the middle of a collaborative process in which they were working diligently to meet her concerns about working with Wyatt.  However, defendants' arguments are based upon several disputed issues of fact which at this juncture must be resolved in Larson's favor.

A portion of the evidence submitted by Larson involves documents evidencing the disciplinary action taken against Younkin in early 2003, in part based upon complaints about harassing behavior directed at Larson.  While defendants dispute the relevance of this historical information, it sets the stage for the interactions between Younkin and Larson concerning Wyatt's behavior over the ensuing months.

Defendants also argue that the September 21, 2004 meeting, followed by Larson's resignation, sounds the death knell for most of her claims.  According to defendants, that

meeting was the beginning of dialogue on how to solve the issue Larson was having with Wyatt and Younkin. They took Larson's September 8, 2004 letter to Florips seriously and set out to return Larson to work in precisely the way she requested in that letter by discussing her return-to-work suggestions. Defendants deny knowing that Larson wanted no contact with Wyatt until that meeting and assert that they left the meeting believing that they had worked out an acceptable solution to move her temporarily to Camp Tillamook and making it clear to her that they were willing to continue to work with her to address her concerns.

The difficulty with this line of reasoning is that Larson's view of what transpired at the September 21, 2004 meeting is very different from defendants' view of what transpired. In view of Larson's testimony concerning what happened at the meeting with Younkin, Florips, and Lenz, it is of little moment that her suggestions were discussed. If leaving work on June 24, 2004 did not do so, Larson's two letters to Florip clearly indicated that she had reached the breaking point when it came to working alongside Wyatt. Despite those letters, three management-level employees neither crafted nor offered a change in her working conditions that eliminated contact with Wyatt. Instead, intent on being "nice" to Wyatt, those managers offered to transfer Larson to Camp Tillamook, subject to the veiled threat that she could be called back to TYAAC during staff shortages which Larson knew to be a daily problem.

Given the history between Younkin and Larson, and particularly given her statement in both her letters to Florip that absent a change she would be "forced to be supervised by and work with the very people who harassed [her], failed to take action to stop the harassing conduct, and minimized [her] opposition to the conduct and/or who will retaliate against [her]" (Defs' Exs 11 & 12), Florip's heavy reliance on Younkin's involvement at the September 21, 2004 meeting is

mystifying.  Florip's failure to contact Larson after her letter of resignation stands as mute confirmation that her perception of the meeting was accurate, namely that management-level employees felt that it was acceptable to put her in a position of working with Wyatt and acceptable to condition the only solution offered (namely that Larson temporarily move into a position at Camp Tillamook) on acceptance of that prospect.

Defendants posit that they believed they had arrived at a workable solution and were willing to talk further and that Larson's perception to the contrary is inherently unreasonable. Defendants point to the timing of the resignation letter, coming only a day after the meeting, as evidence that Larson cut short the dialogue designed to return her to work.  However, an equally plausible reading of the timing of that letter is that Larson felt that the meeting confirmed that she was forced to quit because she would continue to face working with Wyatt.

Viewed in the light most favorable to Larson, the record reveals Wyatt's unabated and escalating sexual harassment of Larson dating back to at least February 2004, Larson's repeated complaints to Younkin about that harassment that were ignored, a workplace where Younkin tolerated or participated in the use of obscene language and the display of sexually explicit materials, and finally Wyatt's verbal and physical intimidation of Larson which prompted Younkin to tell her to "hang in there."  After Larson went on medical leave on June 24, 2004, Younkin first ignored Larson's telephone calls, then contacted her doctor without her permission and rejected her suggestions for a return to work without contact with Wyatt.  Her last-ditch effort to go to a management employee higher in the chain of command than Younkin resulted in two levels of management (Younkin and Florip) and one HR representative (Lenz) rejecting her

flexible suggestions and providing no reassurance that she would not be required to work with Wyatt.

At a minimum, the evidence of the totality of the circumstances under which Larson was working is sufficient to establish a disputed factual issue over whether a reasonable person in Larson's position would have felt that she had no option but to walk away from her job at TYAAC. At oral argument, defendants agreed that if this court so concluded, then triable issues of fact precluded summary judgment in favor of TYAAC and the State of Oregon. This leaves the individual claims against Younkin and Florip.

**C.**  **Claims Against Younkin & Florip**

Larson alleges that Younkin and Florip violated her constitutional rights to procedural due process (First Claim), freedom of speech (Second Claim), and equal protection (Seventh Claim).[13] Younkin and Florip argue that because Larson resigned, she cannot establish that her civil rights were violated by her termination. This argument fails for the same reasons that Larson's claims survive summary judgment with respect to her allegations of constructive termination.

Alternatively, Younkin and Florip contend that they are entitled to qualified immunity from Larson's claims under § 1983 because they acted in good faith in exercising their discretionary supervisory functions.[14] As explained below, a searching review of the record reveals that Larson's Second Claim, for violation of her right to free speech, is premised upon

---

[13]  Wyatt is also named as a defendant in the Second and Seventh claims, but he has filed no motions as yet.

[14]  Florip and Younkin also argued that the claims against them are barred by the Eleventh Amendment and that Larson cannot establish a civil rights violation because she quit. However, defendants have withdrawn the former argument (Reply in Support of Summary Judgment on Behalf of All State Defendants (docket #67), p. 3) and, as discussed above, Larson has submitted sufficient evidence to survive defendants' motions for summary judgment to the extent they are premised upon the latter argument.

communications that will not support such a claim.  Accordingly, Younkin and Florip (as well as Wyatt *sua sponte)* should be granted summary judgment on the Second Claim.  However, they are not entitled to qualified immunity against Larson's due process or equal protection claims.

### 1.  <u>First Amendment Claim – Speech on a Subject of Public Concern</u>

In her Second Claim, Larson  alleges that her First Amendment right to freedom of speech was violated when defendants' terminated her in retaliation for her complaints of sexual harassment.  A public employer may not discharge a public employee on "a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 US 378, 383 (1987).  Whether particular speech is constitutionally protected is a question of law. *Connick v. Myers*, 461 US 138, 148 n7 (1983).  When considering a First Amendment claim brought by a discharged public employee, "[a] two-step analysis determines whether federal courts will protect the speech at issue." *Wheaton v. Webb-Petett*, 931 F2d 613, 618 (9th Cir 1991).  The threshold issue is whether the speech "addresses matters of 'public concern.'" *Id*, quoting *Connick*, 461 US at 146.  If so, then the court must "balance the employee's interest in making [the] statement against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Id* (citations and internal quote marks omitted).  In this case, neither Larson's allegations nor the available evidence will support a finding in favor of Larson on the threshold issue.

In determining whether particular speech addresses a matter of public concern, the court must evaluate the "content, form, and context . . . as revealed by the whole record." *Connick*, 461 US at 147-48.  Of those considerations, "'content is the greatest single factor in the *Connick* inquiry.'" *Havekost v. U.S. Department of the Navy*, 925 F2d 316, 318 (9th Cir 1991), quoting

*Berg v. Hunter*, 854 F2d 238, 243 (7th Cir 1988), *cert denied*, 489 US 1053 (1989).  Larson alleges that she complained about Wyatt's conduct to multiple members of TYAAC management, including Younkin (Second Amended Complaint, ¶¶ 16, 18, 22-23; Larson Decl, ¶¶ 3-5, 10), Lindstrom (Second Amended Complaint, ¶¶ 17, 23; Larson Decl, ¶ 12), and Hovden (Second Amended Complaint, ¶¶ 20, 23).  Her complaints to Younkin concerned specific instances of sexually inappropriate comments and conduct by Wyatt, statements to Younkin that "Wyatt's conduct was sexually inappropriate and harassing," and, on her final day of work, a plea for Younkin's help to "do something about Wyatt [because she] felt [she] had a shark on [her] back and it was getting worse."  Larson Decl, ¶¶ 3-5, 10.  She also complained to Wyatt himself about his conduct, including telling him to "shut up" or that he was "grossing [her] out, please stop," and telling him that he needed to "stop making sexual references at work."  *Id* at ¶ 7.  Viewing the allegations and evidence in the light most favorable to Larson reveals that her communications to TYAAC management were aimed at resolving one issue, namely the inappropriate comments and conduct directed at her by Wyatt.

While the subject of sexual discrimination or harassment in general is a matter of public concern, speech directed at airing or resolving a "workplace grievance" is not.  *See Kokkinis v. Ivkovich*, 185 F3d 840, 844 (7th Cir 1999) (citations omitted) ("The issue of sex discrimination in public employment is, of course, a matter of public concern.  Our precedent makes clear, however, that speaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in *Connick*."); *Havekost*, 925 F2d at 318-19 (circulation of a petition arising from "an internal dispute over the Navy's dress code, scheduling, and responsibility for certain lost

commissary profits" were "the minutiae of workplace grievances" of no more public concern "as would be the length and distribution of coffee breaks."). Larson's complaints are exactly the "type of personnel matters that [the Ninth Circuit has] deemed unprotected under the public concern test, [namely] employment grievances in which the employee is complaining about her own job treatment. . . ." *Thomas v. City of Beaverton*, 379 F3d 802, 808 (9th Cir 2004) (citations and emphasis omitted). *Also see Beyer v. Baker School Dist. 5J*, 2005 WL 351936, *10 (D Or Feb. 14, 2005) (plaintiff's own sexual harassment complaint not a matter of public concern).

Because the record does not reveal any allegations or evidence of speech by Larson addressing a matter of public concern, Larson cannot establish a violation of her First Amendment right. Accordingly, Younkin and Florip should be granted summary judgment against Larson's Second Claim under the First Amendment. For the same reason, this court should *sua sponte* grant summary judgment in favor of Wyatt against the same claim.

### 2. Due Process and Equal Protection Claims

Larson alleges that the collective bargaining agreement, various state and TYAAC policies, and Oregon statutes and regulations provided her with a protected property interest in her employment. Second Amended Complaint, ¶ 32. She also alleges that she was entitled to both a pre-termination and a post-termination hearing, but was deprived of those rights when she was constructively terminated. *Id* at ¶¶ 33, 35-36. She contends that defendants' acts were motivated by their desire to force her to resign and, thereby, avoid the applicable pre-termination and post-termination procedures. *Id* at ¶ 37.

///

///

///

Younkin and Florip contend that they are entitled to qualified immunity from Larson's due process and equal protection claims because they exercised their discretionary authority in good faith.[15]  Younkin claims ignorance of Larson's complaints until mid-June 2004 and asserts that his good faith is evident by virtue of his prompt investigation and discipline of Wyatt within two weeks.  Florip emphasizes his limited involvement in investigating and responding to Larson's complaints and asserts that Larson – not OYA or TYAAC management – cut short the solution-seeking process by responding to their offer of a temporary position at Camp Tillamook and promise to revisit the issue when the temporary position ended with a letter of resignation. The difficulty with these arguments is that they are based on disputed facts which, at least at this juncture, this court must resolve in Larson's favor.  So viewed, the record reveals sufficient evidence to defeat defendants' bid for qualified immunity.

### a.  <u>Legal Standard – Qualified Immunity</u>

The doctrine of qualified immunity insulates government agents from liability for actions taken in good faith while exercising discretionary authority in their official capacity.  *Deorle v. Rutherford*, 272 F3d 1272, 1285 (9th Cir 2001), *cert denied*, 536 US 958 (2002).  The court's initial inquiry must be: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?"  *Saucier v. Katz,*

---

[15] Although not raised by defendants, a due process claim may not be available if state laws adequately protect against a claim of constructive discharge based on sexual harassment.  *See Brogan v. San Mateo County*, 901 F2d 762, 764 (9th Cir 1990), citing *Wood v. Ostrander*, 879 F2d 583, 588 (9th Cir 1989), *cert denied*, 498 US 938 (1990) ("When state remedies are adequate to protect an individual's procedural due process rights, a section 1983 action alleging a violation of those rights will not stand.").

533 US 194, 201 (2001); *Boyd v. Benton County*, 374 F3d 773, 778 (9th Cir 2004) (citing

*Saucier*).  If such a deprivation is shown, the court must then determine whether the right

violated was so clearly established that the officials are not entitled to qualified immunity.

*Saucier*, 533 US at 201.

A right is "clearly established" when "the contours of the right [are] sufficiently clear that

a reasonable official would understand that what he is doing violates that right."  *Anderson v.*

*Creighton*, 483 US 635, 640 (1987).  The relevant, dispositive inquiry in determining whether a

right is clearly established is whether it would be clear to a reasonable public official that his or

her conduct was unlawful in the situation he or she confronted.  *Saucier*, 533 US at 202, citing

*Wilson v. Layne,* 526 US 603, 615 (1999).  The issues are evaluated for objective reasonableness

based upon the information the official had when the conduct occurred, not upon the subjective

intentions of the official.  *Id*, 533 US at 207.

### b.  <u>Constitutional Rights</u>

The basis of both of Larson's remaining constitutional claims for violation of her rights

to equal protection and procedural due process is that Younkin and Florip failed to stop the

sexual harassment to which she was being subjected, culminating in her constructive discharge.

For well over a decade, the Ninth Circuit has recognized that public employees have a

clearly established constitutional right to be free of sexual harassment.  *Bator v. State of Hawaii*,

39 F3d 1021, 1028 (9th Cir 1994).  A supervisor's "failure to investigate and stop the harassment

is itself unlawful."  *Id* at 1029 (citations omitted).  Moreover, "[e]ven if the contours of a

supervisor's responsibility are uncertain, complete inaction in the face of claimed harassment

cannot be objectively reasonable conduct entitling a supervisor to qualified immunity." *Id*
(citations omitted).

In the context of public employment, the failure to stop harassment which results in a
constructive discharge may also support a claim for a due process violation. The "Fourteenth
Amendment's due process guarantee applies to public employees who have a 'property interest'
in the terms or conditions of their employment." *Ulrich v. City and County of San Francisco*,
308 F3d 968, 975 (9th Cir 2002) (citation omitted). In order to prevail on her due process claim,
Larson must prove: "(1) a property interest protected by the Constitution; (2) a deprivation of
the interest by the government; and a (3) lack of required process." *Id* at 974 (citation omitted).
Lack of any protected property interest in employment precludes a due process claim by a public
employee. *Portman v. County of Santa Clara*, 995 F2d 898, 904-05 (9th Cir 1993). Similarly, a
showing that the plaintiff voluntarily resigned or the plaintiff's failure to allege facts sufficient to
support a finding of constructive discharge is fatal to such a claim. *Ulrich*, 308 F3d at 974
(voluntary resignation); *Huskey v. City of San Jose*, 204 F3d 893, 902 (9th Cir 2000).

### c. Defendants' Good Faith Arguments

Younkin and Florip do not quarrel with the potential availability of a due process or
equal protection claim as a remedy to Larson's allegations. Instead, they argue that: (1) because
Larson voluntarily resigned, she cannot prove that she was deprived of her employment, an
essential element of her civil rights claims; and (2) even if Larson clears that hurdle, they acted
in good faith by promptly investigating the harassment by Wyatt and by attempting to find
alternatives to permit Larson to return to work. For the reasons stated above, the first of these
arguments fails because Larson has submitted sufficient evidence that she was constructively

discharged to survive defendants' bid for summary judgment.  The latter argument is a fact-based argument which also fails.

Younkin contends that he did not know about any harassment by Wyatt until June 17, 2004.  However, Larson has submitted evidence that she began reporting harassment by Wyatt much earlier, but that despite her complaints, Younkin took no action until Ferris told him that a group grievance was going to be filed based on Wyatt's behavior.  During the ensuing week, Wyatt's harassing behavior toward Larson intensified, until Larson finally left on medical leave on June 24, 2004.  Assuming the facts in Larson's favor, Younkin ignored her complaints for nearly a year, initiating disciplinary action against Wyatt only when his hand was forced by Ferris's warning of an upcoming group grievance.  A supervisor who fails to reasonably investigate or address an employee's complaints of sexual harassment is not entitled to qualified immunity.  *Bator*, 39 F3d at 1029 (complete inaction in the face of claimed harassment precludes qualified immunity); *see also*, *Murrell v. Sch. Dist. No. 1, Denver, Colorado*, 186 F3d 1238, 1250-52 (10th Cir 1999) (knowledge of and acquiescence in harassing conduct by refusing to reasonably respond precludes qualified immunity); *Jemmot v. Coughlin*, 85 F3d 61, 67-68 (2nd Cir 1996) (supervisors' failure to reasonably investigate or address allegations of harassment not entitled to qualified immunity).

Florip seeks to escape liability by emphasizing his "very limited" involvement in investigating and responding to Larson's complaints.  Florip Aff, ¶ 5.  He states that he recalls a conversation with Younkin in the summer of 2004 when Younkin told him that Larson was concerned about some comments Wyatt had made to her.  *Id*.  Younkin investigated and later determined that Wyatt should be removed from trial service status as a manager.  *Id*.  According

to Florip, that was his only involvement until receiving Larson's September 8, 2004 letter and participating in the September 21, 2004 meeting.

Florip professes ignorance of Larson's complaints about Wyatt until June 2004 and asserts that it is "consistent with [his] discretion and authority to leave [matters such as Larson's complaints] primarily up to the [TYAAC] Director."  Defendants' Concise Statement of Material Facts, ¶ 25.  However, Florip's job included "actively participat[ing] in grievances, disciplinary action, and dismissal of employees and approv[ing] or diapparov[ing] all personnel actions including selections, dismissals, promotion and disciplinary action, respond[ing] to and facilitat[ing] resolution of complaints and grievances for staff."  Defs' Ex 16, p. 2.  He was to "meet regularly with . . . camp directors . . . to make decisions regarding . . . personnel matters . . . [and] evaluate[] subordinate managers, and support staff work performance."  *Id*.  As part of fulfilling those duties, he was expected to have daily contact with OYA staff and administrators and was responsible for review of "personnel matters . . . including being involved in the retention, recruitment and discipline process."  *Id*, p. 4.  Given this range of responsibility over personnel matters, Florip would have been involved in the decision to discipline Younkin in January 2003, which stemmed in part from complaints by Larson.  Moreover, it defies explanation that Florip would rely on Younkin to investigate complaints of sexual harassment by Larson who had previously been the target of Younkin's harassment.

Florip characterizes the meeting with Larson as a searching review of possible options available to have Larson return to work, including assurances that "another manager would always be present" during the minimal hours that Larson's schedule would overlap with Wyatt and an express pledge to Larson of OYA's "willingness to re-engage discussions . . . to consider

her concerns and options prior to the [proposed] temporary assignment ending and her work situation changing." Florip Aff, ¶ 7. However, Larson's testimony paints a much different picture, in which Florip failed or refused to give Larson any reassurance that she would not have to work with Wyatt, offered her a transfer into a temporary position, and left unchallenged Younkin's statement that she could be called back to TYAAC any time it was short-staffed. This version of events is sufficient to create a fact issue concerning the reasonableness of of Florip's response to Larson's complaints of sexual harassment.

Accordingly, to the extent Younkin and Florip seek qualified immunity from Larson's procedural due process and equal protection claims on the basis of their good faith in carrying out their supervisory responsibilities, their motions should be denied.

## RECOMMENDATION

For the reasons stated above, the State Defendants' Motions for Summary Judgment (docket #43) should be GRANTED as to the Second Claim against Younkin and Florip for violation of Larson's First Amendment right to freedom of speech and otherwise DENIED. In addition, the court should *sua sponte* GRANT summary judgment to Wyatt against the Second Claim.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due **March 15, 2007.** If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

///

///

35 - FINDINGS AND RECOMMENDATION

///

///

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 23rd day of February, 2007.


/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge